MARDI GRAS WORLD, LLC, ET AL.                    CIVIL ACTION

VERSUS                                          NO. 18-4745 C/W 18-5579

MARQUETTE TRANSPORTATION                         SECTION "R" (2)
CO., ET AL.


## ORDER AND REASONS

Before the Court is the motion for partial summary judgment from defendants Marquette Transportation Company Gulf-Inland, LLC, and Marquette Transportation Company, LLC (collectively, "Marquette"), on the claims for economic loss damages from plaintiff Mardi Gras World, LLC ("Mardi Gras World").[1] Because Mardi Gras World has a proprietary interest in the damaged property, the defendants' motion is denied.


## I.    BACKGROUND

This case arises from an allision on the Mississippi River.[2]  On May 7, 2018, the M/V STEVE RICHOUX, the defendants' towing vessel, allided with

---

[1]      R. Doc. 32 (Case No. 18-4745).
[2]      *See* R. Doc. 1 at 3 ¶ 11 (Case No. 18-4745).

the Robin Street Wharf on the Mississippi River's left descending bank.[3] The municipal address for the wharf is 1380 Port of New Orleans Place,[4] and it is owned by the Board of Commissioners for the Port of New Orleans ("the Board").[5] Mardi Gras World did not actually own any physical property damaged in the allision.[6] Rather, Mardi Gras World leases the Robin Street Wharf from the Board,[7] along with adjacent property from the Board and other lessors.[8]

The parties entered into the lease in 2008[9] and can extend it through 2032.[10] The agreement provides Mardi Gras World with an interest in a large area of property along the Mississippi River. The lease includes the Robin Street Wharf, which covers approximately 125,000 square feet of interior space, including "built out office and shop space," and approximately 25,000 square feet of exterior space "and underlying wharf substructure."[11] The leased premises also include approximately 270,000 square feet of the

---

[3]     R. Doc. 32-3 at 1 ¶ 1 (Case No. 18-4745). Mardi Gras World does not contest Marquette's statement of facts. *See* R. Doc. 41 at 4 (Case No. 18-4745).

[4]     R. Doc. 32-3 at 1 ¶ 1 (Case No. 18-4745).

[5]     *Id.* at 1 ¶ 2.

[6]     *Id.* at 2 ¶ 4.

[7]     *Id.* at 2 ¶ 3.

[8]     *See, e.g.*, R. Doc. 32-6 at 27, 66-67 (Case No. 18-4745).

[9]     *See id.* at 51-52.

[10]    *See id.* at 15 ¶ 3(B).

[11]    *See id.* at 13 ¶ (c)1(A)(i).

Orange Street Wharf,[12] and over five acres of land next to the wharves.[13] Mardi Gras World can use these premises for a "Mardi Gras Museum, exhibition, office, catering, and meeting facility(ies)," as well for "minor construction . . . related to artistic and creative activities."[14] But it must make improvements to these premises, which "shall become the property of the Board."[15] It also must pay taxes associated with the property.[16] It must maintain property insurance at its "sole cost and expense . . . in favor of Lessors."[17] And it must "at its own cost, risk and expense . . . repair, replace, or restore any and all of the Leased Premises which may become the subject of loss, damage or destruction."[18]

Following the damage to these lease premises, Mardi Gras World[19] filed this action against Marquette.[20] Mardi Gras World alleges that the

---

[12]     *See id.* at 13-14 ¶ (c)1(A)(ii).
[13]     *See id.* at 14 ¶ (c)1(B), 75-78.
[14]     R. Doc. 32-6 at 31 ¶ 5(A) (Case No. 18-4745).
[15]     *Id.* at 40 ¶ 12(D).
[16]     *Id.* at 45 ¶ 24.
[17]     *Id.* at 37 ¶ 10(E)(i).
[18]     *Id.* at 34 ¶ 9(B).
[19]     This complaint also included as plaintiffs Blaine Kern's Mardi Gras World, Inc.; New Orleans Hotel Collection, L.L.C.; and Blaine Kern Artists, Inc. *See* R. Doc. 1 at 1 (Case No. 18-4745). Both Blaine Kern's Mardi Gras World, Inc., and New Orleans Hotel Collection, L.L.C., have since voluntarily dismissed their claims. *See* R. Doc. 30 (Case No. 18-4745); R. Doc. 31 (Case No. 18-4745). Marquette does not assert the instant motion against Blaine Kern Artists, Inc. *See* R. Doc. 32-1 at 1 n.1 (Case No. 18-4745).
[20]     R. Doc. 1 (Case No. 18-4745).

incident caused "increased and additional expenses, structural damage, property damage, delayed production, lost production, increased overhead, interruption of business, stigma, damaged reputation, loss of use, lost profits, repair costs, and other physical and economic damages not yet realized."[21]  Marquette subsequently filed a limitation complaint,[22] and the two complaints were consolidated.[23]  AGCS Marine Insurance Company, Mardi Gras World's insurer, and the Board have separately intervened as claimants.[24]

Marquette now moves for partial summary judgment on Mardi Gras World's claims for economic damages.[25]  Mardi Gras World opposes the motion.[26]

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v.*

---

[21]    *Id.* at 3 ¶ 12.
[22]    R. Doc. 1 (Case No. 18-5579).
[23]    R. Doc. 5 (Case No. 18-4745); R. Doc. 4 (Case No. 18-5579).
[24]    *See* R. Doc. 8 (Case No. 18-4745); R. Doc. 21 (Case No. 18-4745).
[25]    R. Doc. 32 (Case No. 18-4745).
[26]    R. Doc. 41 (Case No. 18-4745).

*Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp.

948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322 (emphasis added))).

## III. DISCUSSION

Marquette argues that, pursuant to *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927), Mardi Gras World cannot recover economic damages.[27] In *Robins Dry Dock*, the Supreme Court stated a rule limiting tort liability: "[N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." 275 U.S. at 309. The Fifth Circuit has "interpreted *Robins Dry Dock* to mean that there can be no recovery for economic losses caused by an unintentional maritime tort absent physical damage to property in which the victim has a proprietary interest." *Amoco Transp. Co. v. S/S MASON LYKES*, 768 F.2d 659, 666 (5th Cir. 1985).[28]

Here, Mardi Gras World seeks to recover, among other things, economic losses caused by an unintentional maritime tort.[29] To proceed, therefore, Mardi Gras World must have suffered (a) "physical damage" to (b)

---

[27] *See, e.g.*, R. Doc. 32-1 at 13 (Case No. 18-4745).

[28] According to the Fifth Circuit, this rule serves as a "pragmatic limitation imposed by the Court upon the tort doctrine of foreseeability." *State of La. ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, 1023 (5th Cir. 1985) (en banc). That is, under *Robins Dry Dock*, a harm may be foreseeable but nevertheless not cognizable.

[29] *See* R. Doc. 1 at 3 ¶ 12 (Case No. 18-4745).

property in which it has a "proprietary interest." The parties do not dispute that physical damage occurred.[30] The wharf that suffered physical damage, though, was owned by the Board and leased to Mardi Gras World.[31] At issue, therefore, is whether Mardi Gras World had a "proprietary interest" in this wharf. The Court finds that Mardi Gras World's leasehold constitutes a sufficient proprietary interest to allow it to seek recovery under *Robins Dry Dock* for economic loss.

### A. Mardi Gras World's "Proprietary Interest" Under Its Lease

A plaintiff need not own property outright to have a "proprietary interest" in it. *See State of Veracruz v. BP, P.L.C.* (*In re Deepwater Horizon*), 784 F.3d 1019, 1026 (5th Cir. 2015) ("The *Robins Dry Dock* Court itself, however, intimated that something perhaps just shy of outright ownership might suffice to show the requisite proprietary interest."). If the plaintiff is not the actual owner of the property, though, he must be "'tantamount' to an owner" to recover. *Plains Pipeline, L.P. v. Great Lakes Dredge & Dock Co.*, 620 Fed. App'x 281, 285 (5th Cir. 2015) (quoting *Veracruz*, 784 F.3d at 1026).

---

[30]    R. Doc. 32-3 at 1 ¶ 2 (Case No. 18-4745).
[31]    *Id.* at 1 ¶¶ 1-2, 2 ¶ 3.

To identify whether a plaintiff's interest in property is tantamount to ownership, courts consider whether the plaintiff's rights in the property exhibit "incidents of ownership." *See Veracruz*, 784 F.3d at 1026 (quoting *Louisville & Nashville R.R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469, 474 (5th Cir.1979)). Specifically, the Fifth Circuit looks to three main factors: (1) "responsibility for repair," (2) "responsibility for maintenance," and (3) "actual possession or control." *Tex. E. Transmission Corp. v. McMoRan Offshore Expl. Co.*, 877 F.2d 1214, 1225 (5th Cir. 1989) (citing *Bayou Lacombe*, 597 F.2d at 474). Here, Mardi Gras World's interest in the wharf, as established by its lease with the Board, exhibits all three factors.

First, Mardi Gras World has responsibility for repair of the wharf. The lease agreement between Mardi Gras World and the Board states: "Lessee [Mardi Gras World] agrees that it shall at its own cost, risk and expense promptly and with due diligence *repair*, replace, or restore any and all of the Leased Premises [property including the Robin Street Wharf] which may become the subject of loss, damage or destruction."[32] Marquette acknowledges that Mardi Gras World "has broad responsibility to repair

---

[32]    R. Doc. 32-6 at 34 ¶ 9(B) (Case No. 18-4745) (emphasis added).

damages to the leased premises."[33]  Indeed, Marquette explicitly "does not challenge" Mardi Gras World's "claim for repair costs."[34]

Second, Mardi Gras World has responsibility for maintenance of the wharf.  According to the terms of the lease, "Lessee shall be responsible for and shall at its own cost, risk and expense perform and pay all costs of *maintenance and repairs*."[35]  Indeed, "[d]uring the Term of the Lease, Lessors shall have *no responsibility whatsoever* to perform any construction, maintenance or repair work on the Leased Premises."[36]  The lease does require Mardi Gras World to "obtain prior written approval from the Board for any maintenance, repairs, [or] dredging."[37]  But the adjacent provisions make clear that the Board's ministerial function does not divest Mardi Gras World of the responsibility for maintaining the wharf.  Indeed, the same requirement of approval for maintenance also applies to repairs, which—as noted above—Marquette does not appear to challenge.

Third, Mardi Gras World has actual possession or control of the wharf.  Black's Law Dictionary defines "actual possession" as "*[p]hysical occupancy* or control over property. Cf. *constructive possession*."  *Actual Possession*,

---

[33]     R. Doc. 32-1 at 8 (Case No. 18-4745).
[34]     *Id.* at 12.
[35]     R. Doc. 32-6 at 33 ¶ 7(A) (Case No. 18-4745) (emphasis added).
[36]     *Id.* (emphasis added).
[37]     *Id.*

*Black's Law Dictionary* (11th ed. 2019) (first emphasis added); *accord Tex. E.*, 877 F.2d at 1225 (when discussing three-part proprietary interest test, examining whether company had "*functional* possession or control" over property (emphasis added)). Mardi Gras World's use of the property has both "an attraction component and . . . an event venue component."[38] As an attraction, Mardi Gras World operates tours that allow the public "to see how the floats and props are constructed for Mardi Gras."[39] As an event venue, Mardi Gras World primarily rents the premises for corporate functions.[40] Overall, these activities suggest that Mardi Gras World has physical occupancy of the property. Indeed, the lease describes Mardi Gras World as "occup[ying]" the wharf.[41] And Marquette's stipulations also identify Mardi Gras World as an "occupant[] of the Robin Street Wharf."[42] Mardi Gras World, therefore, actually possesses the property.

The Fifth Circuit has stated this element of the test in the disjunctive—actual possession *or* control. Arguably a finding that Mardi Gras World

---

[38]    R. Doc. 41-3 at 2:11-12 (Case No. 18-4745).

[39]    *Id.* at 2:12-15.

[40]    *Id.* at 2:15-19.

[41]    R. Doc. 32-6 at 33 ¶ 8(B) (Case No. 18-4745) ("Lessee, from the time of its *occupancy* and until the Leased Premises are vacated by Lessee, shall assume sole liability for the condition of the Leased Premises . . . ." (emphasis added)). As the contract establishes a lease of real property, any occupancy would be "physical."

[42]    R. Doc. 32-7 at 1 (Case No. 18-4745).

actually possesses the wharf should satisfy this prong. Nevertheless, the Court finds that the level of control Mardi Gras World exercises over the property also satisfies a conjunctive test.[43]

Specifically, the lease states that Mardi Gras World has "complete control or 'GARDE' over the Leased Premises."[44] It "exercise[s] complete control or 'Garde' over . . . access."[45] And it has "sole liability for the condition of the Leased Premises as well as of any constructions, utilities and other improvements."[46] Although limits on use exist, the limiting language broadly describes the purpose for which Mardi Gras World leases the property, rather than purporting to circumscribe how Mardi Gras World runs its business. For example, the lease restricts Mardi Gras World's use of the wharf to that of "a Mardi Gras Museum, exhibition, office, catering, and

---

[43] Consequently, Mardi Gras World would also satisfy a conjunctive reading of the definition of "actual possession," which itself already incorporates the concept of control. *See Actual Possession*, *Black's Law Dictionary* (11th ed. 2019) (defining "actual possession" as "[p]hysical occupancy *or* control" (emphasis added)).

[44] R. Doc. 32-6 at 33 ¶ 8(B) (Case No. 18-4745). "The Louisiana Supreme Court's definition of custody is based on the French legal concept of *garde*." *Royer v. Citgo Petroleum Corp.*, 53 F.3d 116, 118-19 (5th Cir. 1995). Generally, "[t]he things in one's garde are 'those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them.'" *Haas v. Atl. Richfield*, 799 F.2d 1011, 1014 (5th Cir. 1986) (quoting *Loescher v. Parr*, 324 So. 2d 441, 449 n.7 (La. 1975)).

[45] R. Doc. 32-6 at 19 ¶ 17(A) (Case No. 18-4745).

[46] *Id.* at 33 ¶ 8(B).

12

meeting facility(ies)," as well as to "minor construction . . . related to artistic and creative activities."[47]   The lease also establishes safety practices consistent with these very activities.  For example, "Lessee shall not use the Leased Premises for any heavy construction or any activity involving welding or use of an open flame or toxic material."[48]

Such reasonable restrictions do not prevent Mardi Gras World from exercising control over the wharf.  Even an outright owner could encounter analogous zoning or environmental regulations circumscribing its use of property.   And restrictions are not uncommon in commercial leases in general, *see, e.g.*, 5 Alan M. Weinberger, *Thompson on Real Property* § 44.03 (Thomas ed. 2019), or the Board's leases in particular.[49]   Overall, therefore, and when viewed in light of Mardi Gras World's possession of the property, the Court finds the level of control accorded to Mardi Gras World in the lease sufficient to qualify as an incident of ownership.

---

[47]    *Id.* at 31 ¶ 5(A).  Similarly, the lease qualifies Mardi Gras World's ability to use the wharf as a berthing facility.  *See id.* at 32 ¶ 5(D) ("Lessee shall not dock or berth any vessel at the Leased Premises without prior written approval of the Board.  The Board reserves the right to levy and collect any and all charges for the berthing of any vessels at the Leased Premises.").

[48]    *Id.* at 31 ¶ 5(A).

[49]    *See* R. Doc. 41-2 at 1 ¶ 5 ("The limited restrictions on use by Mardi Gras World of the Robin Street Wharf included in the Agreement are typical and customary in lease agreements between the Board and its lessees.").

In addition to the *Texas Eastern* factors, some courts have looked to the original distinction drawn in *Robins Dry Dock*—that between a time charterer of a ship and a demise charterer—to illustrate the concept of a proprietary interest. *See, e.g., Veracruz*, 784 F.3d at 1031. Specifically, the *Robins Dry Dock* Court found that a time charter did not confer a sufficient property interest[50] to permit recovery for economic loss. *See* 275 U.S. at 307-08. But "[t]he Court left open the possibility that a 'demise' agreement might satisfy the proprietary interest requirement even if the 'time charter' at issue in that case did not." *Veracruz*, 784 F.3d at 1026 (citing *Robins Dry Dock*, 275 U.S. at 308).

The Fifth Circuit has elaborated on the distinction between a time charter and a demise charter. Under a time charter, "the owner's people continue to navigate and manage the vessel, but her carrying capacity is taken by the charterer for a fixed time for the carriage of goods." *Bayou Lacombe*, 597 F.2d at 473 n.3 (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 4-1 (2d ed. 1975) [hereinafter Gilmore & Black]). Under a demise charter, on the other hand, "the charterer takes over the ship, lock, stock and barrel, and mans her with his own people." *Id.* (emphasis

---

[50] The *Robins Dry Dock* Court referred to "property right[s]." *See* 275 U.S. at 308. The "proprietary interest" test, the touchstone in this Circuit, satisfies the Supreme Court requirement. *See, e.g., Guste*, 752 F.2d at 1021.

removed) (quoting Gilmore & Black § 4-1). Under this analogy, possessing a proprietary interest sufficient to satisfy the *Robins Dry Dock* rule requires having "the incidents of ownership attributable to the demise-charterer." *See Bayou Lacombe*, 597 F.2d at 474.

Here, the nature of Mardi Gras World's interest in the wharf resembles that of a demise charterer's interest in a ship.[51] Mardi Gras World has "take[n] over" the wharf and "man[ned] her with [its] own people," *Bayou Lacombe*, 597 F.2d at 473 n.3 (emphasis removed) (quoting Gilmore & Black § 4-1). Indeed, Mardi Gras World is liable for the damage caused to the wharf.[52] And although Mardi Gras World cannot use the wharf entirely without restriction, "restrictions on use" also "typically" occur in demise contracts. *See* 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 11:3 (6th ed. Oct. 2018 update); *see also, e.g.*, *Limon v. Berryco Barge Lines, L.L.C.*, No. G-07-0274, 2011 WL 835832, at *7 (S.D. Tex. Mar. 7, 2011) (finding that a demise charter can have "restrictions on use" that are "not inconsistent with possession and control"). *But see Bayou Lacombe*, 597

---

[51] The Fifth Circuit has observed that the demise charter comparison may "perhaps [be] less onerous" than its subsequently developed tests. *See Veracruz*, 784 F.3d at 1031. Consequently, an interest that exhibits all the *Texas Eastern* factors would also likely complete the original *Robins Dry Dock* analogy.

[52] *See* R. Doc. 32-6 at 34 ¶ 9(B) (Case No. 18-4745).

F.2d at 474 (noting that under a demise charter, "the shipowner retains merely a right of reversion").

Indeed, "the demise charterer is analogous" to "the lessee of a house and lot." *Id.* at 473 n.3 (emphasis removed) (quoting Gilmore & Black § 4-1). "Put differently, if [the plaintiff] shows that it has interests in the [property] similar to the interests it would acquire in a vessel from a demise charter *or in real estate from a lease*, then it can satisfy the requirements of *Robins Dry Dock*." *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, 497 F. Supp. 2d 787, 796 (E.D. La. 2007) (Vance, J.) (emphasis added). Here, Mardi Gras World has a lease on real estate. Consequently, to the extent such a lease mirrors the demise charter, it also should satisfy the *Robins Dry Dock* rule. Overall, therefore, whether viewed in terms of the three-factor *Texas Eastern* test, or in terms of the original *Robins Dry Dock* analogy that these factors attempted to illustrate, Mardi Gras World has a proprietary interest that permits it to sue for economic loss.

Significantly, the facts of this case differ materially from those of other cases in which the Fifth Circuit found that a proprietary interest did not exist. In *Texas Eastern* itself, for instance, the plaintiff attempted to recover economic damages following the rupture by an anchor of a pipeline carrying natural gas. *See* 877 F.2d at 1219, 1223. But there, in addition to not owning

the pipeline, the plaintiff neither "possess[ed] the exclusive right to use" the property, nor had "any responsibility to perform repairs" following its damage. *See id.* at 1224-25. Rather, the plaintiff's responsibility was largely limited to "routine maintenance, consisting of the painting, cleaning, and inspecting" of some of the pipeline's "appurtenances." *See id.* at 1225. Here, by contrast, Mardi Gras World's rights and responsibilities under its lease are of an entirely different order. Mardi Gras World leases an expansive property[53] for a variety of its own business functions,[54] over which it has extensive improvement,[55] insurance,[56] tax,[57] repair,[58] and maintenance responsibilities.[59]

Similarly, in *Bayou Lacombe*, which the *Texas Eastern* court analyzed, a railroad company with a "contractual right to use [a] bridge" could not recover economic damages after a vessel damaged the bridge, preventing trains from crossing. *See* 597 F.2d at 470. But the railroad never possessed or controlled the bridge, or contributed to its upkeep. *See id.* at 474. Again, by contrast, Mardi Gras World exhibits a wholly different relationship with

---

[53]    *See* R. Doc. 32-6 at 13-14 ¶ (c)1 (Case No. 18-4745).
[54]    *See id.* at 31 ¶ 5(A).
[55]    *See id.* at 40 ¶ 12(D).
[56]    *See id.* at 37 ¶ 10(E)(i).
[57]    *See id.* at 45 ¶ 24.
[58]    *See id.* at 34 ¶ 9(B).
[59]    *See* R. Doc. 32-6 at 33 ¶ 7(A) (Case No. 18-4745).

the wharf: Mardi Gras World's rights are far more sweeping than the "right of [a] user in the nature of an easement." *Id.* at 473.

Other cases likewise reveal that Mardi Gras World's interest in the wharf is dissimilar to circumstances where the Fifth Circuit has barred recovery of economic losses under *Robins Dry Dock. See, e.g., In re Bertucci Contracting Co., L.L.C.*, 712 F.3d 245, 246 (5th Cir. 2013) (disallowing economic damages to residents of community affected by bridge closure following vessel allision); *Dick Meyers Towing Serv., Inc. v. United States*, 577 F.2d 1023, 1024 (5th Cir. 1978) (per curiam) (disallowing economic damages to boat operator following delays caused by lock failure). Indeed, the Court has found no case where *Robins Dry Dock* barred the economic loss claims of a plaintiff with interests of the same character as Mardi Gras World's.

When other courts have analyzed facts similar to those here, though, they have reached the same conclusion as this Court. Specifically, the weight of the district court authority supports finding a proprietary interest arising from such a lease. *See Dixie Marine, Inc. v. Q Jake M/V*, No. 16-12415, 2017 WL 3600574, at *1, *8 (E.D. La. Aug. 22, 2017) (concluding that a plaintiff operating under a similar lease with the Board met all three factors and

therefore had a proprietary interest in a wharf);[60] *Diversified Grp., LLC v. La. Carriers, Inc.*, No. 12-1161, 2013 WL 2147547, at *4 (E.D. La. May 15, 2013) (concluding that "Dixie Marine has a proprietary interest in the wharf"); *In re Complaint of Clearsky Shipping Corp.*, No. 96-4099, 1999 WL 705553, at *4-5, *7-8 (E.D. La. Sept. 8, 1999) (finding evidence of retailers' proprietary interest in spaces leased at the Riverwalk made summary judgment improper); *New Orleans Steamboat Co. v. M/V JAMES E. WRIGHT*, Nos. 87-4437, 88-1236, 1990 WL 128212, at *1, *8, *10 (E.D. La. Aug. 23, 1990) (finding "excursion boat enterprise" had proprietary interest in wharf based on a "Preferential Assignment Agreement" with the Board).

### B. The Effect of Louisiana Statutes on Mardi Gras World's "Proprietary Interest"

Marquette contends that, in addition to the restrictions created by Mardi Gras World's lease, restrictions created by the Louisiana statutes that govern riparian property rights also prevent Mardi Gras World from having a sufficient interest to recover. The lease, though, references these statutes,[61] and does not transfer a greater interest than they permit. Consequently,

---

[60] *See also* R. Doc. 41-1 (Case No. 18-4745).

[61] *See* R. Doc. 32-6 at 28 (Case No. 18-4745) ("[T]he Parties acknowledge that this Lease is made pursuant to the authority granted in Louisiana Revised Statutes 9:1102.1 and 9:1102.2.").

consideration of these laws does not alter the Court's finding that Mardi Gras World has a proprietary interest in the wharf.

Louisiana's statutory provisions do not prevent the lease at issue from satisfying the *Texas Eastern* test. First, the statutes do not remove Mardi Gras World's responsibility for repairing the dock. Indeed, the statutes make no reference to "repair." *See* La. R.S. 9:1102.1, 1102.2. Second, the statutes do not divest Mardi Gras World of responsibility for maintaining the wharf. They do provide that "wharves . . . shall remain subject to the administration and control of the governing authorities with respect to their maintenance." La. R.S. 9:1102.1(A); *see also id.* 9:1102.2(A)(1)(e), 34:22. The lease, though, specifies the nature of this administration and control: the Board must provide written approval for Mardi Gras World's maintenance.[62] Written approval by the Board does not reduce Mardi Gras World's responsibility to finance and carry out the maintenance.

Finally, the limits imposed by statute do not substantively alter the nature of Mardi Gras World's actual possession or control under the lease. With regard to actual possession, the statutes do emphasize the state's right to retake possession of the property. *See* La. R.S. 9:1102.1, 9:1102.2. This right, however, does not dispossess Mardi Gras World of its *actual*

---

[62] *See* R. Doc. 32-6 at 33 ¶ 7(A) (Case No. 18-4745).

possession of the wharf—that is, its "functional possession," *Tex. E.*, 877 F.2d at 1225, or "[p]hysical occupancy," *Actual Possession*, *Black's Law Dictionary* (11th ed. 2019). Nor do these statutory provisions add substantively to the limitations on control already outlined in the lease. Indeed, the existence of these statutory provisions has not foreclosed recovery under *Robins Dry Dock* in the district court decisions rendered after their enactment. *See Dixie Marine*, 2017 WL 3600574, at *8; *Diversified Grp.*, 2013 WL 2147547, at *4; *Clearsky*, 1999 WL 705553, at *4-5, *7-8; *New Orleans Steamboat Co.*, 1990 WL 128212, at *8, *10.

Marquette argues that the Fifth Circuit's holding in *Veracruz* suggests that these statutes prevent Mardi Gras World from having a proprietary interest. But *Veracruz* does not change the fundamentals of the *Robins Dry Dock* analysis. In *Veracruz*, the Fifth Circuit had to determine whether, under *Robins Dry Dock*, Mexican states could bring a claim for economic loss attributable to property allegedly damaged in the BP oil spill. *See* 784 F.3d at 1022-23. Specifically, the court had to decide whether the group of Mexican states or the Mexican federal government was the "true owner" of the Mexican property. *See* 784 F.3d at 1022, 1027. The court concluded that while the states had a "role . . . in managing some of the country's property,"

they did not have the "crucial proprietary interest for purposes of *Robins Dry Dock*." *Id.* at 1031.

The Mexican states do not present a close analogy to Mardi Gras World. As an initial matter, the Fifth Circuit in *Veracruz* had to adjudicate between two governments that both claimed ownership of national assets. *See, e.g., id.* at 1027-28. Indeed, the court prefaced its reasoning by "recogniz[ing] that the *Robins Dry Dock* analytical framework does not easily map on to an intragovernmental relationship." *Id.* at 1030. Here, by contrast, the nature of Mardi Gras World's interest in the wharf more clearly maps onto that of an "owner pro hac vice," *id.* at 1031 (quoting *Bayou Lacombe*, 597 F.2d at 473 n.3), a proprietary interest countenanced by *Robins Dry Dock*.

Furthermore, the *Veracruz* court found "essentially decisive," *id.* at 1027, a constitutional provision interpreted to mean that "Mexico's public domain over these assets is inalienable and cannot be taken away from the *federal government* by adverse possession, by either Mexican nationals or foreigners," *id.* (quoting Jorge A. Vargas, *Mexican Law: A Treatise for Legal Practitioners and International Investors* § 34.4 (2001) (emphasis added)). Here, by contrast, the statutes do not purport to endow the Board with a similar level of supremacy. Rather, the statutes envision a more limited

sphere of power where, for example, "wharves . . . shall remain subject to the administration and control of the governing authorities with respect to their maintenance and to the fees and charges to be exacted for their use by the public," La. R.S. 9:1102.1(A).

Similarly, when looking outside the Mexican constitution, the *Veracruz* court concluded that "[Mexican] federal law places the bulk of the power . . . in the hands of the federal government." 784 F.3d at 1031. Here, though, the *Texas Eastern* analysis suggests that Mardi Gras World wields sufficient power with respect to the wharf to have a proprietary interest in it. And, while the *Veracruz* court confirmed that *Texas Eastern* did not "sanction[] recovery for something less than ownership," it at no point repudiated the *Texas Eastern* factors. *See id.* at 1026. Indeed, Judge Barbier—who authored the district court opinion affirmed in *Veracruz*— subsequently applied the *Texas Eastern* test to find that a company leasing a wharf from the Port of New Orleans had "a sufficient proprietary interest to recover economic loss." *Dixie Marine,* 2017 WL 3600574, at *8. That lease is substantially similar to the one at issue here.[63] Thus, neither Louisiana statute nor the holding of *Veracruz* requires the Court to find that

---

[63]     *See* R. Doc. 41-1 (Case No. 18-4745).

Louisiana law prevents Mardi Gras World from having a proprietary interest in the wharf.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Marquette's motion for partial summary judgment.

New Orleans, Louisiana, this __11th__ day of September, 2019.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE